**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS**

| | |
|---|---|
| MICHAEL CECERE, derivatively on behalf of RCI HOSPITALITY HOLDINGS, INC., | |
| Plaintiff, | Case No.: |
| vs. | |
| ERIC S. LANGAN, PHILLIP MARSHALL, NOUR-DEAN ANAKAR, YURA BARABASH, STEVEN JENKINS, LUKE LIROT, and TRAVIS REESE, | **DEMAND FOR JURY TRIAL** |
| Defendants, | |
| and | |
| RCI HOSPITALITY HOLDINGS, INC., | |
| Nominal Defendant. | |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

**INTRODUCTION**

Plaintiff Michael Cecere ("Plaintiff"), by his undersigned attorneys, derivatively and on behalf of RCI Hospitality Holdings, Inc. ("RCI" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants Eric S. Langan, Phillip Marshall, Nour-Dean Anakar, Yura Barabash, Steven Jenkins, Luke Lirot, and Travis Reese (collectively, the "Individual Defendants" and together with RCI, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of RCI, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets and violations of Sections 14(a), 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").  As for his complaint against the Defendants, Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters,

1

based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding RCI, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a shareholder derivative action that seeks to remedy wrongdoing committed by RCI's directors and officers between August 10, 2017 through the present (the "Relevant Period").

2.     RCI is a holding company that operates numerous "upscale gentlemen's clubs and restaurants."[1]  RCI was founded in 1983 by Robert Watters, who initiated the Company's business in "elegant clubs with restaurants," i.e. the "Rick's Cabaret gentlemen's club concept." Mr. Watters took the Company public in 1995. The Company merged with the XTC Cabaret chain in 1998, which was controlled and operated by Defendant Eric S. Langan ("Langan"). Defendant Langan became CEO and president of RCI the following year.

3.     The Company currently has two reportable segments: Nightclubs and Bombshells.

4.     RCI generates revenue at their nightclubs through "the sale of alcoholic beverages, food and merchandise items; service in the form of cover charge, dance fees, and room rentals; and through other related means such as ATM commissions and vending income, among others." The Nightclubs segment offers "unique" and "quality" entertainment.

---

[1] *Bombshells Restaurant & Bar,* http://bombshellsfranchise.com/ (last visited June 24, 2019).

5.     According to the Company's website[1], the Bombshells segment consists of eight military themed bar restaurants, all in Texas.

6.     The Company's website further touts, about Bombshells, "Enjoy great food with friends, co-workers or family in the military themed dining or on our huge patio with rollup garage doors and outdoor bar. Bombshells restaurant has an exciting atmosphere, great food, live entertainment with nightly DJ and a great location with plenty of parking."

7.     During the fiscal year ended September 30, 2018, Bombshells' sales mix was "60% alcoholic beverages and 40% food, merchandise and other, which had a segment gross margin (revenues less cost of goods sold) of 75%."

8.     In 2018, a number of negative articles [2] published on *Seeking Alpha* and elsewhere shed light on numerous inappropriate activities connected with the Company, including undisclosed loans to Company executives, questionable uses of corporate assets, and prevalent criminal activity at one of the Company's Bombshell locations.[3]

9.     On December 11, 2018, RCI filed a Notification of Late Filing on a Form 12b-25 with the SEC disclosing that RCI would not be able to timely file its annual report for the fiscal year ended September 30, 2018 (the "2018 Form 12b-25"). According to the 2018 Form 12b-25, this was due to "delays in completing the audit of its financial statements for the year ended September 30, 2018."

---

[1] *Id.*

[2] *RCI Hospitality (RICK): Overvalued Roll Up with Hidden Related Party Transactions, Conflicts of Interest, SEC Violations, and 50%+ Downside,* file:///R:/RCI%20Hospitality%20Holdings/Evidence/Seekingaplha%20Unredacted.pdf (last visited June 24, 2019). Detroit Bear, *RCI Hospitality: Negative Comps And SEC Smoke, Stay Away,* file:///R:/RCI%20Hospitality%20Holdings/Evidence/RCI%20Hospitality_%20Negative%20Comps%20And%20SEC%20Smoke,%20Stay%20Away%20-%20RCI%20Hospitality%20Holdings,%20Inc.%20(NASDAQ_RICK)%20_%20Seeking%20Alpha.pdf (last visited June 24, 2019); https://www.khou.com/article/news/local/se-houston-bar-targeted-by-district-attorneys-office-for-overserving/285-562114519 (last visited on June 24, 2019).

[3] https://cw39.com/2018/06/11/local-bombshells-closes-after-judge-backs-up-harris-county-das-request-banning-bar-from-selling-alcohol/ (last visited on June 24, 2019).

10.     On this news, RCI's share price fell $1.37, approximately 6%, from the previous trading day to close at $22.36 per share on December 12, 2018.

11.     On May 10, 2019, RCI, again, filed a Notification of Late Filing on a Form 12b-25 with the SEC (the "May 2019 Form 12b-25"). The May 2019 Form 12b-25 revealed that RCI could not timely file its quarterly report on Form 10-Q with the SEC for the period ended March 31, 2019 (the "2Q19 10-Q") due to an ongoing SEC inquiry that was initiated after several negative articles were published about RCI in 2018. The May 2019 Form 12b-25 also disclosed that the Company's Audit Committee engaged independent counsel to conduct an internal investigation over the events outlined.

12.     On this news, RCI's share price fell more than 7%, or $1.67, from the previous trading day, to close at $20.48 per share on May 13, 2019.

13.     In breach of their fiduciary duties, prior to and during the Relevant Period, the Individual Defendants engaged in and or caused the Company to engage in numerous (often undisclosed) related party transactions, including (1) loaning Company money to RCI's CEO, Defendant Langan; (2) allowing Defendant Luke Lirot ("Lirot"), a director of RCI and a lawyer, to take on legal work for RCI; (3) using RCI's shell company (Citation Land, LLC) to send donations to Defendant Langan's children's school; (4) providing executives, and family members of executives at RCI with extremely high car allowances; (5) obtaining loans from an RCI employee, who was also the brother of a Company director; (6) allowing Defendant Langan, who was indebted to a lawyer, to give said lawyer corporate business in lieu of paying him back; and (7) awarding numerous projects initiated by RCI to a construction company that Defendant Langan had undisclosed financial interests in (collectively, the "Related Party Transactions").

14.     In addition to the aforementioned, the Individual Defendants engaged in and/or caused the Company to engage in further questionable uses of corporate assets consisting of the following:  (1) RCI inexplicably owns multiple undisclosed properties, including residential; (2) RCI purchased at least six planes in the past 10 years; (3) these planes are used in questionable ways; and (4) the Company has had multiple failed business ventures (the "Questionable Uses of Corporate Assets").

15.     The Individual Defendants also failed to maintain internal controls, which the Company disclosed in its management's assessment and the audit report included in the Company's annual report for the fiscal year ended September 30, 2018, filed with the SEC on a Form 10-K on December 31, 2018 (the "2018 10-K").

16.     In further breach of their fiduciary duties during the Relevant Period, the Individual Defendants personally made and/or caused the Company to make a series of materially false and/or misleading statements and omissions regarding the Company's business, operations, prospects and legal compliance. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that: (1) the Company engaged in the Related Party Transactions and Questionable Uses of Corporate Assets (together, the "Mismanagement"); (2) the Mismanagement would likely subject the Company to heightened regulatory scrutiny, including by the SEC; (3) the Company's prospects would be harmed by investigations into its corporate governance, including by rendering RCI incapable of timely filing its financial statements; and (4) the Company failed to maintain internal controls. As a result, the Company's statements regarding RCI's business, performance, and prospects were materially false and misleading.

17.     Furthermore, the Individual Defendants breached their fiduciary duties by causing the Company to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations.

18.     According to the Company's quarterly report filed with the SEC on a Form 10-Q on February 11, 2019, approximately 14,111 shares of the Company's stock were repurchased at inflated prices between October 1, 2018 and December 31, 2018 for approximately $355,738. As the Company's stock was actually only worth $15.61 per share, the price at which it was trading on June 3, 2019, the Company overpaid approximately $135,465 in total.

19.     As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.  The Individual Defendants failed to correct and caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

20.     In light of the Individual Defendants' misconduct, which has subjected the Company, its Chief Executive Officer ("CEO"), and its Chief Financial Officer ("CFO") to being named as defendants in federal securities fraud class action lawsuits pending in the United States District Court for the Southern District of Texas,[5] the need to undertake internal investigations, the need to implement adequate internal controls, the losses from the waste of corporate assets, the losses due to the unjust enrichment of the Individual Defendants who were improperly over-compensated by the Company and/or who benefitted from the wrongdoing alleged herein, the Company will have to expend many millions of dollars.

---

[5] Currently, there are two federal securities fraud class action lawsuits pending in the United States District Court for the Southern District of Texas (the "Securities Class Actions"). The Company's CEO is named as a defendant in the Securities Class Actions, while the Company's CFO has been named in one of the two securities fraud class actions.

21.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and the liability of certain of them in the Securities Class Actions, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested or independent directors, a majority of RCI's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

22.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n, Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j, 78t), and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder, and raise a federal question pertaining to the claims made in the Securities Class Actions based on violations of the Exchange Act.

23.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

24.     Additionally, diversity jurisdiction is conferred by 28 U.S.C. § 1332. Plaintiff and the Individual Defendants are citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

25.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

26.     The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation conducting business and maintaining operations in this District, or he is an individual who has minimum contacts with this District to justify the exercise of jurisdiction over them.

27.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

28.     Venue is proper in this District because RCI and the Individual Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

29.     Plaintiff is a current shareholder of RCI. Plaintiff has continuously held RCI common stock at all relevant times.  Plaintiff is a citizen of the State of Nevada.

### Nominal Defendant RCI

30.     Defendant RCI is incorporated in Texas, and its stock trades on the NASDAQ under the ticker symbol "RICK." The Company's corporate headquarters are located at 210737 Cutten Road, Houston, Texas 77066.

### Defendant Langan

31.     Defendant Eric S. Langan ("Langan") has served as President, CEO and as a Director of RCI since December 1998. He has served as Chairman of the Board since 1999. According to the Company's Schedule 14A filed with the SEC on July 18, 2018 (the "2018 Proxy Statement"), as of July 2, 2018, Defendant Langan beneficially owned 700,000 shares of the Company's common stock. Given that the price per share of the Company's common stock

at the close of trading on July 2, 2018 was $32.03, Defendant Langan owned approximately $22.4 million worth of RCI stock.

32.     Defendant Langan has received and continues to receive lavish compensation for his roles within the Company, most recently receiving $1,060,271 in compensation during the fiscal year ended September 30, 2018. According to the 2018 Proxy Statement, on May 1, 2018, the Company entered into a new employment agreement with Defendant Langan, making Langan's annual salary alone $1,200,000.  The terms of the agreement commenced on May 1, 2018 and end on January 1, 2020.

33.     The Company's 2018 Proxy Statement stated the following about Defendant Langan:

> Eric S. Langan, age 50, has been a director since 1998, and our President, CEO and Chairman since 1999. He began his career in the hospitality industry in 1989 and has developed significant expertise in sports bar/restaurants and adult entertainment nightclubs, including related areas of real estate development and finance. Mr. Langan built the XTC Cabaret nightclub brand and merged it into RCI in 1998, expanding the scope of the company. He has been instrumental in bringing professional marketing, management, finance, and technology practices and systems to the gentlemen's club industry. As one of the original founders of the National Association of Club Executives (ACE), Mr. Langan has been an active member of its Board of Directors since 1999. Through these activities, Mr. Langan has acquired the knowledge and skills necessary to successfully operate adult entertainment businesses.

34.     Upon information and belief, Defendant Langan is a citizen of the State of Texas.

**Defendant Marshall**

35.     Defendant Phillip Marshall ("Marshall") has served as the Company's CFO since May 2007. According to the 2018 Proxy Statement, as of July 2, 2018, Defendant Marshall beneficially owned 13,810 shares of the Company's common stock. Given that the price per

share of the Company's common stock at the close of trading on July 2, 2018 was $32.03, Defendant Marshall owned approximately $442,334 worth of RCI stock.

36.     Defendant Marshall has received and continues to receive lavish compensation for his roles within the Company, most recently receiving $311,589 in compensation during the fiscal year ended September 30, 2018. According to the 2018 Proxy Statement, on May 1, 2018, the Company entered into a new employment agreement with Defendant Marshall, making Marshall's annual salary alone $325,000.  The terms of the agreement commenced on May 1, 2018 and ends on January 1, 2020.

37.     The Company's 2018 Proxy Statement states the following about Defendant Marshall:

> Phillip Marshall has served as our Chief Financial Officer since May 2007. He was previously controller of Dorado Exploration, Inc., an oil and gas exploration and production company, from February 2007 to May 2007. He previously served as Chief Financial Officer of CDT Systems, Inc., a publicly held water technology company, from July 2003 to September 2006. In 1972, Mr. Marshall began his public accounting career with the international accounting firm, KMG Main Hurdman. After its merger with Peat Marwick, Mr. Marshall served as an audit partner at KPMG for several years. After leaving KPMG, Mr. Marshall was partner in charge of the audit practice at Jackson & Rhodes in Dallas from 1992 to 2003, where he specialized in small publicly held companies. Mr. Marshall is also a trustee of United Mortgage Trust, United Development Funding IV and United Development Funding V, publicly held real estate investment trusts.

38.     Upon information and belief, Defendant Marshall is a citizen of the State of Texas.

**Defendant Anakar**

39.     Defendant Nour-Dean Anakar ("Anakar") has served as a Company director since September 2010. He is also a member of the Nominating Committee, Compensation Committee and Audit Committee.

40.     Defendant Anakar has received and continues to receive compensation for his roles within the Company, most recently receiving $20,000 in compensation during the fiscal year ended September 30, 2018.

41.     The Company's 2018 Proxy Statement states the following about Defendant Anakar:

> Nour-Dean Anakar, age 61, became a director on September 14, 2010. Mr. Anakar is a seasoned gaming and hospitality senior executive with a 28 year successful track record in leading the development and management of top ranked gaming and hospitality operations in the United States, Europe, and Latin America. He was Chairman and CEO of Sorteo Games Inc. from 2002 through 2014 and since 2015 has been a partner of the Mckinney Capital Group and oversees all international developments. He received his BA in Management Science from Duke University and CHA in Hospitality Management from the Conrad Hilton College at the University of Houston. Mr. Anakar's experience managing and developing businesses in industries with similar characteristics to ours make him an excellent fit to the Board.

42.     Upon information and belief, Defendant Anakar is a citizen of the State of California.

**Defendant Barabash**

43.     Defendant Yura Barabash ("Barabash") has served as a Company Director since September 2017. He is also a member of the Nominating Committee, Compensation Committee and Audit Committee. Defendant Barabash has received and continues to receive compensation for his roles within the Company, most recently receiving $20,000 in compensation during the fiscal year ended September 30, 2018.

44.     The Company's 2018 Proxy Statement states the following about Defendant Barabash:

> Yura Barabash, age 43, became a director on September 19, 2017. Mr. Barabash has been the Senior Vice President of Finance at Motorsport Network LLC (www.motorsportnetwork.com) in Miami, the largest motorsport and auto-related digital media company in the world, a position he has held since 2016.

Mr. Barabash has extensive corporate finance experience across multiple industries domestically and internationally, and has been involved in multiple equity and debt financings and M&A transactions for public and private companies in the US, China, Brazil, EU and Russia. Prior to joining Motorsport Network, he was an investment banker at Primary Capital, Rodman & Renshaw and Merrill Lynch. He holds a B.A. from Sevastopol City University in Ukraine and a Master in International Affairs from Columbia University in New York City, and is fluent in Russian. Mr. Barabash is a valuable member of the Board of Directors based on his extensive corporate finance and investment banking experience across multiple industries domestically and internationally with a wide range of transactions (debt and equity). He also possesses extensive financial modeling and investor relationship experience and experience in diligence, governance and accounting.

45.     Upon information and belief, Defendant Barabash is a citizen of the State of Florida.

**Defendant Jenkins**

46.     Defendant Steven Jenkins ("Jenkins") served as a Company Director from June 2001 to August 8, 2019.

47.     Defendant Jenkins received compensation for his roles within the Company, most recently receiving $20,000 in compensation during the fiscal year ended September 30, 2018.

48.     The Company's 2018 Proxy Statement states the following about Defendant Jenkins:

Steven L. Jenkins, age 61, has been a director since June 2001. Since 1988, Mr. Jenkins has been a certified public accountant with Pringle Jenkins & Associates, P.C., located in Houston, Texas. Mr. Jenkins is the President and owner of Pringle Jenkins & Associates, P.C. Mr. Jenkins has a BBA Degree (1979) from Texas A&M University. Mr. Jenkins is a member of the AICPA and the TSCPA. Mr. Jenkins' impressive accounting background makes him a valuable asset to the Board and the Audit Committee.

49.     Upon information and belief, Defendant Jenkins is a citizen of the State of Texas.

**Defendant Lirot**

50.　　Defendant Lirot has served as a Company Director since September 2007. He is also a member of the Nominating Committee and Compensation Committee. According to the 2018 Proxy Statement, as of July 2, 2018, Defendant Lirot beneficially owned 518 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on July 2, 2018 was $32.03, Defendant Lirot owned approximately $16,591 worth of RCI stock.

51.　　Defendant Lirot has received and continues to receive compensation for his roles within the Company, most recently receiving $20,000 in compensation during the fiscal year ended September 30, 2018.

52.　　The Company's 2018 Proxy Statement states the following about Defendant Lirot:

> Luke Lirot, age 61, became a director on July 31, 2007. Mr. Lirot received his law degree from the University of San Francisco in 1986. After serving as an intern in the San Francisco Public Defender's Office in 1986, Mr. Lirot returned to Florida and established a private law practice where he continues to practice and specializes in adult entertainment issues. He is a past President of the First Amendment Lawyers' Association and has actively participated in numerous state and federal legal matters. Mr. Lirot represents as counsel scores of individuals and entities within our industry. Having practiced in this area for over 30 years, he is aware of virtually every type of legal issue that can arise, making him an important member of the Board.

53.　　Upon information and belief, Defendant Lirot is a citizen of the State of Florida.

**Defendant Reese**

54.　　Defendant Travis Reese ("Reese") has served as Executive Vice President and as a Company Director since 1999. According to the 2018 Proxy Statement, as of July 2, 2018, Defendant Reese beneficially owned 11,805 shares of the Company's common stock. Given

that the price per share of the Company's common stock at the close of trading on July 2, 2018 was $32.03, Defendant Reese owned approximately $378,114 worth of RCI stock.

55.     Defendant Reese has received and continues to receive lavish compensation for his role within the Company, most recently receiving $388,206 in compensation during the fiscal year ended September 30, 2018. According to the 2018 Proxy Statement, on May 1, 2018 the Company entered into a new employment agreement with Defendant Reese, making Reese's annual salary alone $390,000.   The terms of the agreement commenced on May 1, 2018 and ends on January 1, 2020.

56.     The Company's 2018 Proxy Statement states the following about Defendant Reese:

> Travis Reese, age 48, became a director and our Executive Vice President in 1999. From 1997 through 1999, Mr. Reese had been a senior network administrator at St. Vincent's Hospital in Santa Fe, New Mexico. During 1997, Mr. Reese was a computer systems engineer with Deloitte & Touche. From 1995 until 1997, Mr. Reese was Vice President with Digital Publishing Resources, Inc., an Internet service provider. From 1994 until 1995, Mr. Reese was a pilot with Continental Airlines. From 1992 until 1994, Mr. Reese was a pilot with Hang On, Inc., an airline company. Mr. Reese has an Associate's Degree in Aeronautical Science from Texas State Technical College. Mr. Reese has been involved in the adult entertainment industry since 1992. His experience and knowledge in this industry is essential to the Board's oversight of our businesses.

57.     Upon information and belief, Defendant Reese is a citizen of the State of Texas.

58.     The Individual Defendants possessed the power and authority to control the contents of the Company's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of the Company's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with the Company, and their access to material information available to them but

not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

**FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

59.     By reason of their positions as officers, directors, and/or fiduciaries of RCI and because of their ability to control the business and corporate affairs of RCI, the Individual Defendants owed RCI and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage RCI in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of RCI and its shareholders so as to benefit all shareholders equally.

60.     Each director and officer of the Company owes to RCI and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

61.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of RCI, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.

62.     To discharge their duties, the officers and directors of RCI were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

63.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty,

good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of RCI, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

64.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

65.     To discharge their duties, the officers and directors of RCI were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of RCI were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Texas and the United States, and

pursuant to RCI's own Code of Ethics for Principal Executive and Senior Financial Officers (the "Code of Ethics"), The Charter of the Audit Committee of the Board of Directors and The Charter of the Compensation Committee of the Board of Directors;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how RCI conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of RCI and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that RCI's operations would comply with all applicable laws and RCI's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

66.    Each of the Individual Defendants further owed to RCI and the shareholders the duty of loyalty requiring that each favor RCI's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

67.    At all times relevant hereto, the Individual Defendants were the agents of each other and of RCI and were at all times acting within the course and scope of such agency.

68.    Because of their advisory, executive, managerial, and directorial positions with RCI, each of the Individual Defendants had access to adverse, non-public information about the Company.

69.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by RCI.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

70.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing.  The Individual Defendants caused the Company to conceal the true facts as alleged herein.  The Individual Defendants further aided and abetted and assisted each other in breaching their respective duties.

71.    The purpose and effect of the conspiracy, common enterprise, and common course of conduct was, among other things, to: (i) facilitate and disguise the Individual

Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of Sections 14(a), 10(b) and 20(a) of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) to artificially inflate the Company's stock price.

72.     The Individual Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

73.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

74.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants, and of RCI, and was at all times acting within the course and scope of such agency.

## RCI'S CODE OF ETHICS AND COMMITTEE CHARTERS

### The Code of Ethics

75.     The Company adopted the Code of Ethics to "…to deter wrongdoing and promote ethical conduct, and full, fair, accurate, timely, and understandable disclosure of financial information in the periodic reports of the Company."

76.    The Code of Ethics provides, as to who the Code of Ethics applies to:

This Code is applicable to the following persons (hereinafter referred to as the "Officers"):

      1.    The Company's principal executive officers;

      2.    The Company's principal financial officers;

      3.    The Company's principal accounting officer or controller; and

      4.    Persons performing similar functions.

77.    Arguably, the Code of Ethics applies to all the Individual Defendants and at the very least to Defendants Langan, Marshall and Reese who each hold executive and/or financial officer positions within the Company. The remaining Individual Defendants may fit into the fourth aforementioned category. Defendants Anakar, Barabash, Jenkins and Lirot are all members of the Compensation Committee and/or the Audit Committee. Thus, they perform "similar functions" to the other three aforementioned categories. Further, all the Individual Defendants have signed the 10-K's and solicited Proxy Statements attesting to the dealings and financials of the Company. Moreover, the Individuals Defendants are bound by the duties laid out in the charters of the committees that they are members of.

78.    The Code of Ethics provides, as to compliance with the Code of Ethics and with laws, rules regulations, that:

Each Officer shall adhere to and advocate the following principles and responsibilities governing professional and ethical conduct:

      1.    Act with honesty and integrity, avoiding actual or apparent conflicts of interest in personal and professional relationships.

      2.    Provide information that is full, fair, accurate, complete, objective, relevant, timely, and understandable to the Company's Board of Directors, the Securities and Exchange Commission, the Company's stockholders, and the public.

      3.    Comply with applicable governmental laws, rules, and regulations.

4. Act in good faith, responsibly, with due care, competence and diligence, without misrepresenting material facts or allowing your independent judgment to be subordinated.

5. Take all reasonable measures to protect the confidentiality of non-public information about the Company acquired in the course of your work except when authorized or otherwise legally obligated to disclose such information and to not use such confidential information for personal advantage.

6. Assure responsible use of and control over all assets and resources employed or entrusted to you.

7. Promptly report to the Chairman of the Audit Committee:

   a. any information you may have regarding any violation of this Code;

   b. any actual or apparent conflict of interest between personal and/or professional relationships involving management or any other employee with a role in financial reporting disclosures or internal controls;

   c. any information you might have concerning evidence of a material violation of the securities or other laws, rules or regulations applicable to the Company and its operations;

   d. significant deficiencies in the design or operation of internal controls that could adversely affect the Company's ability to record, process, summarize or report financial data; or

   e. any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's financial reporting, disclosures or internal controls.

79.    The Code of Ethics provides, as to reporting and compliance procedures, that:

As discussed above, Officers shall promptly report any violation of this Code to the Chairman of the Company's Audit Committee.

Reports of violations under this Code received by the Chairman of the Audit Committee shall be investigated by the Audit Committee. If the Audit Committee finds a violation of this Code, it shall refer the matter to the full Board of Directors.

In the event of a finding that a violation of this Code has occurred, appropriate action shall be taken that is reasonably designed to deter wrongdoing and to promote accountability for adherence to this Code, and may include written notices to the individual involved of the determination that there has been a violation, censure by the Board, demotion or re-assignment of the individual involved, suspension with or without pay or benefits, and up to and including, if appropriate, termination of the individual's employment. In determining what

action is appropriate in a particular case, the Board of Directors (or the independent directors of the Board as the case may be) shall take into account all relevant information, including the nature and severity of the violation, whether the violation was a single occurrence or repeated occurrences, whether the violation appears to have been intentional or inadvertent, whether the individuals in question had been advised prior to the violation as to the proper course of action and whether or not the individual in question had committed other violations in the past.

### **The Charter of the Audit Committee of the Board of Directions**

80.    According to the Audit Committee Charter, the stated purpose of the Audit

Committee is to:

- Oversee the accounting and financial reporting processes of RCI Hospitality Holdings, Inc. (the "Company"), including the Company's disclosure controls and procedures and system of internal controls and audits of the Company's consolidated financial statements.
- Oversee the Company's relationship with its independent auditors, including appointing or changing the Company's auditors and ensuring their independence.
- Provide oversight regarding significant financial matters.

In carrying out Audit Committee functions, the Audit Committee must maintain free and open communication with the Company's independent auditors and the Company's management.

81.    According to the Audit Committee Charter, one of the stated responsibilities of

the Audit Committee, regarding internal controls is:

*Internal Controls; Risk Assessment.* The Audit Committee will discuss with management and the independent auditors the design, implementation, adequacy and effectiveness of the Company's internal controls. The Audit Committee will also meet separately with the independent auditors, with and without management present, to discuss the results of their examinations. The Audit Committee will provide oversight over the system of internal controls, relying upon management's and the independent auditors' representations and assessments of, and recommendations regarding, these controls. The Audit Committee will review any required disclosures regarding the Company's internal controls

82.     Another stated responsibility of the Audit Committee, regarding Related Party Transactions, is to "review and approve all related party transactions."

83.     Further, the Audit Committee has the responsibility to investigate. The Audit Committee Charter, in relevant part, states:

> *Ability to Investigate; Retention of Advisors.* The Audit Committee has the power to investigate any matter brought to its attention, with full access to all the Company books, records, facilities and employees. The Audit Committee has the sole authority to select, retain and terminate consultants, legal counsel or other advisors to advise the Audit Committee, at the expense of the Company, and to approve the terms of any such engagement and the fees of any such consultants, legal counsel or advisors. In selecting a consultant or other advisor, the Audit Committee will take into account factors it considers appropriate or as may be required by applicable law or listing standards.

84.     Defendants Anakar, Barabash and Jenkins all serve as members of the Audit Committee.

## The Charter of the Compensation Committee of the Board of Directions

85.     According to the Compensation Committee Charter, the stated purpose of the Compensation Committee is to:

> discharge the responsibilities of the Board of Directors (the "Board") relating to the evaluation and compensation of the Corporation's Chief Executive Officer (the "CEO"), President and other senior executives, and to discharge the responsibilities of the Committee under applicable rules and regulations. The Committee also makes recommendations to the Board regarding succession planning and development for senior executives and positions as needed.

86.     Under the section titled "Committee Activities," the Compensation Committee Charter lists many different activities that the Compensation Committee is responsible for, some of them being:

- Report on compensation policies and practices with respect to the Corporation's executive officers as required by SEC rules.
- Review and report on risks arising from the Corporation's compensation policies and practices for employees as required by SEC rules.

- Consider factors that could affect the independence or represent a conflict of interest on the part of any compensation consultant, independent legal counsel, or other adviser the Committee may retain and report thereon as required by SEC and NASDAQ rules.

87.     Defendants Anakar, Barabash, Jenkins and Lirot all serve as members of the Compensation Committee.

88.     In violation of the Code of Ethics, the Audit Committee Charter and the Compensation Committee Charter, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Mismanagement and caused the Company to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including violations of Section 14(a), 10(b) and 20(a) of the Exchange Act, and failing to report the same.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

89.     RCI is a holding company. The Company purports to operate numerous "upscale gentlemen's clubs and restaurants." The Company was first known as Rick's Cabaret International, Inc. The Company's name was changed to RCI Hospitality Holdings, Inc. in 2014.

90.     RCI's website touts, "[s]ince going public in 1995, we have transformed into a leading hospitality holding company. Our subsidiaries own and operate over forty establishments under multiple brands throughout the nation."

91.     RCI's subsidiary brands include: Rick's, Club Onyx, XTC Cabaret, Jaguars Club, Bombshells and Tootsie's Cabaret, to name a few.

92.     In 2008, the Company was number 87 on Forbes list of the 200 Best Small Companies.

93.     RCI's website goes on to state:

We have been profiled in The Wall Street Journal, Fortune, MarketWatch, Corporate Board Member, Smart Money, USA Today, The New York Daily News and other publications. The Rick's Cabaret-NYC Steakhouse is listed in Zagat's New York Nightlife and included in the TONY 100 list of fine Manhattan dining establishments by Time Out New York. Options in RICK are traded on the Chicago Board of Options Exchange (CBOE).

**The Mismanagement**

94.     On June 10, 2018, October 2, 2018 and May 30, 2019, negative articles emerged detailing the vast wrongdoings perpetuated by the Individual Defendants at the Company titled "RCI Hospitality (RICK): Overvalued Roll Up with Hidden Related Party Transactions, Conflicts of Interest, SEC Violations, and 50% + Downside" (the "June 2018 Article"); "RCI Hospitality: Troubling Relationships Reinforce Short Thesis" (the "October 2018 Article"); and "RCI Hospitality: Negative Comps And SEC Smoke, Stay Away" (the "2019 Article"). The articles detailed the Mismanagement and widespread failures to maintain internal controls.

*The Related Party Transactions*

95.     The June 2018 Article revealed that RCI was no stranger to related party transactions. Indeed, they were occurring as early as 2005, if not earlier. In 2005, RCI filed a debt collection lawsuit in Harris County, Texas against Defendant Langan's brother, Patrick Langan,[6] who had defaulted on a loan from the Company. Unfortunately, for RCI and the Company's investors, the Individual Defendants did not learn their lesson and related party transactions continued for years to come.

---

[6] Ricks Cabaret Internatl Vs. Langan Patrick https://unicourt.com/case/tx-hrc-ricks-cabaret-internatl-i-vs-langan-patrick-523798 (last visited June 24, 2019).

96.     As aforementioned, executives and directors of the Company have used, and continue to use RCI to enter into related party transactions to their benefit as well as the benefit of their affiliates. These transactions include:[7]

(a)     **RCI loaning money to its CEO, Defendant Langan**

For example, in 2014, Langan's ex-wife filed an appeal[8] to her and Langan's 2012 divorce proceeding (the "Divorce Proceeding"). During the Divorce Proceeding, it was revealed that Defendant Langan had taken a loan out from RCI that was undisclosed in RCI's SEC filings. At the time of the appeal, the remaining balance of Defendant Langan's debt to RCI was apparently $59,875. The June 2018 article further revealed that "Eric had taken out over $1.29 million of margin loans against his RCI shares."

(b)     **Defendant Lirot, a Director at RCI, taking on legal work for RCI**

Lirot frequently appears as RCI's lawyer. For example, Defendant Lirot is listed as the Company's counsel in the following lawsuits[9]:

- Kertesz v. Ricks Cabaret
- Lusskin v. Ricks Cabaret
- Saleh v. Miami Square Gardens (RCI)

Yet, the Company failed to include Defendant Lirot's legal services as related party transactions.

---

[7] *RCI Hospitality (RICK): Overvalued Roll Up with Hidden Related Party Transactions, Conflicts of Interest, SEC Violations, and 50%+ Downside,* file:///R:/RCI%20Hospitality%20Holdings/Evidence/Seekingaplha%20Unredacted.pdf. (last visited June 24, 2019).

[8] *Jante Langan v. Eric Scott Langan* Appeal from 300th District Court of Brazoria County (memorandum opinion), https://law.justia.com/cases/texas/fourteenth-court-of-appeals/2014/14-12-01134-cv.html (last visited June 24, 2019).

[9] Kertesz v. Rick;s Cabaret International Inc., https://www.courtlistener.com/docket/4233765/kertesz-v-ricks-cabaret-international-inc/ (last visited June 24, 2019). Lusskin v. Rick's Cabaret international, Inc., https://www.pacermonitor.com/public/case/624084/LUSSKIN_v_Ricks_Cabaret_International,_Inc (last visited June 24, 2019). Saleh v. Miami Gardens Square One, Inc., https://www.courtlistener.com/docket/4626408/saleh-v-miami-gardens-square-one-inc/ (last visited June 24, 2019).

It is unclear to what extent Defendant Lirot was compensated for this work, but the Company has recorded over $3 million in legal expenses over the past few years.

### (c) RCI sending donations to Defendant Langan's children's school through an RCI shell company, Citation Land LLC

According to the June 2018 Article, RCI's subsidiary, Citation Land LLC had donated $5,000-$9,999 to Defendant Langan's children's school. Specifically, the June 2018 Article outlined:

> Citation Land LLC (one of RCI's shell companies) has been a donor to St. Thomas Episcopal School, a K-12 school in Houston, which the CEO's children attend. In the only Report on Giving that is available on the school's website (2015-2016), Citation Land LLC donated $5,000-$9,999 (STES Annual Report on Giving). Corporate donations are not uncommon, but they are typically sent to a cause that helps the broader community, rather than directly to an executive's kids' private school. In addition, the free publicity and community goodwill corporations receive from donations justifies the expense. Donating through a shell company does not provide any benefit for the company and while immaterially financially, it is another use of the company piggy bank for personal benefits.

### (d) RCI providing its executives (and sometimes family members) extremely high car allowances

According to the 2018 Proxy Statement, Defendant Langan spent $45,950 in automobile expenses, Defendant Marshall spent $11,601 in automobile expenses and Defendant Reese spent $29,104 in automobile expenses. Further, the Company's annual report for the fiscal year ended September 30, 2014, filed on December 15, 2014 with the SEC on a Form 10-K stated, in relevant part: "Mr. Langan and his family also received the use of certain automobiles in each year."

### (e) RCI borrowing money from an employee, Defendant Anakar's brother, Ed Anakar

RCI reported this transaction in its 2018 10-K, which stated:

In November 2018, we borrowed $500,000 from Ed Anakar, an employee of the Company and the brother of our director Nour dean Anakar. The note bears interest at the rate of 12% per annum and matures in November 2021. The note is payable in monthly installments of interest only with a balloon payment of all unpaid principal and interest due at maturity.

> (f)     **Defendant Langan providing Robert Axelrod, whom he was personally indebted to, with legal work and corporate business for RCI**

According to the Divorce Proceeding, at the time of the appeal, Defendant Langan was indebted to a "Robert Axelrod" $38,500. Notably, Robert Axelrod has been listed as the "Agent" of many of RCI's subsidiaries. These subsidiaries include, but are not limited to, RCI Dining Services (Vee) Inc., RCI Dining Services (Manana), Inc., RCI Entertainment (Austin), Inc., and RCI Ih 635 Property, Inc, to name a few.[10] Some of the subsidiaries that Robert Axelrod is an agent of were created around the same time of Defendant Langan's debt was to him. These findings support the June 2018 Article's claims that in lieu of paying Robert Axelrod back directly, Defendant Langan instead "give him RCI's legal work and corporate business."

> (g)     **Defendant Langan's undisclosed financial interests in a construction company, Tannos Construction, which has been awarded numerous construction projects initiated by RCI.**

Louis Tannos is the President of Tannos Construction & Development, LLC and one of the Principles of Tannos Land Holding LLC. Importantly, the other Principle of Tannos Land Holding LLC is Defendant Langan. Defendant Langan repeatedly comes up as a "principle," "member" or "company contact" of Tannos Land Holding LLC. Further, Tannos Construction's website homepage features numerous pictures of construction it has done on Bombshells. The connection, and financial interests, between Defendant Langan and Tannos Construction

---

[10] Rci Companies in Texas, https://corporatesdb.com/tx/rci (last visited June 24, 2019).

remained undisclosed in RCI's recent SEC filings, even though over the past several years RCI may have paid around $20 million to Tannos Construction for Bombshell construction projects and other projects. The October 2018 article further stated, in relevant part:

- RCI's primary construction provider, Tannos Construction, set up an investment entity called Tannos Land Holdings that's partly owned by RCI CEO Eric Langan.
- Since creation of the Langan-owned investment vehicle, Tannos Construction has been awarded 10+ construction projects RCI has initiated including multiple Bombshells locations and RCI's new $6 million headquarters.
- Tannos may have received upwards of $20 million from RCI over the last three years based on Bombshells construction.
- Given the CEO's undisclosed financial interests, RCI's over-investment in Bombshells build-outs now makes sense.
- Filings with the Texas Secretary of State show a second RCI executive also has a financial interest in one of the Tannos ventures.

### *Questionable Uses of Corporate Assets*

97.     Besides the inappropriate Related Party Transactions, the Individual Defendants have used, and continue to use, RCI's corporate assets inappropriately to their benefit while harming the Company. These other questionable uses of corporate assets include:[11]

(a)     **RCI owns multiple properties including residential houses, a warehouse and airplane hangers**

The Harris County Appraisal District's website revealed the following laundry list of properties inexplicably owned by the Company.

| Account Number | Owner Name | Property Address | Zip | Impr Sq Ft | Market Value | Appraised Value |
|---|---|---|---|---|---|---|
| 1305660000003 | RCI HOLDING INC | 13903 SOUTH FWY | 77047 | 0 | $537,748 | $537,748 |
| 1305660000002 | RCI HOLDINGS INC | 13903 SOUTH FWY | 77047 | 0 | $1,520,855 | $1,520,855 |
| 1380900010001 | RCI HOLDINGS INC | 10737 CUTTEN RD | 77066 | 38,592 | $4,044,522 | $4,044,522 |
| 0451850000183 | RCI HOLDINGS INC | 0 S SAM HOUSTON PKY E | 77047 | 0 | $995,782 | $995,782 |
| 0340810600026 | RCI HOLDINGS INC | 511 KENTUCKY ST | 77587 | 1,152 | $45,697 | $45,697 |

---

[11] *RCI Hospitality (RICK): Overvalued Roll Up with Hidden Related Party Transactions, Conflicts of Interest, SEC Violations, and 50%+ Downside*, file:///R:/RCI%20Hospitality%20Holdings/Evidence/Seekingaplha%20Unredacted.pdf (last visited June 24, 2019).

| 0340810600028 | RCI HOLDINGS INC | 0 KENTUCKY | 77587 | 0 | $43,708 | $43,708 |
|---|---|---|---|---|---|---|
| 0340810600031 | RCI HOLDINGS INC | 810 HOUSTON BLVD | 77587 | 0 | $22,500 | $22,500 |
| 1200430040001 | RCI HOLDINGS INC | 6888 SOUTHWEST FWY | 77036 | 8,832 | $3,201,449 | $3,201,449 |
| 0731870000017 | RCI HOLDINGS INC | 3113 BERING DR | 77057 | 11,696 | $1,579,219 | $1,579,219 |
| 0731870000022 | RCI HOLDINGS INC | 5705 FAIRDALE LN | 77057 | 0 | $552,405 | $552,405 |
| 0731870000198 | RCI HOLDINGS INC | 0 BERING DR | 77057 | 0 | $438,690 | $438,690 |
| 1207980020057 | RCI HOLDINGS INC | 13807 NAPLES PARK LN | 77070 | 1,792 | $174,994 | $174,994 |
| 1333040010006 | RCI HOLDINGS INC | 6003 FINLAND CT | 77379 | 3,798 | $342,097 | $342,097 |
| 1330350010004 | RCI HOLDINGS INC | 24628 TOMBALL PKY | 77375 | 8,190 | $6,867,779 | $6,867,779 |
| 1338350020001 | RCI HOLDINGS INC | 20516 KATY FWY DR | 77449 | 0 | $1,829,970 | $1,829,970 |
| 0480380010029 | RCI HOLDINGS INC | 8319 THORA LN # 78 | 77379 | 12,880 | $458,087 | $458,087 |
| 1182750010002 | RCI HOLDINGS INC | 9009 AIRPORT BLVD | 77061 | 8,926 | $791,390 | $791,390 |
| 1182750010003 | RCI HOLDINGS INC | 0 AIRPORT BLVD | 77061 | 0 | $263,310 | $263,310 |
| 1375440020001 | RCI HOLDINGS INC | 13732 E FREEWAY | 77015 | 8,310 | $4,484,518 | $4,484,518 |
| 0854790000002 | RCI HOLDINGS INC | 10106 OLENTANGY ST | 77075 | 1,731 | $134,397 | $134,397 |

(b) **Over the past 10 years, at least 6 airplanes have been purchased on behalf of RCI**

According to the June 2018 Article:

> In the last 10 years the company has purchased at least six planes ('08, '10, Feb '12, Dec '13, Apr '17, Dec '17). Management continuously trades in their planes to upgrade to the latest models to fulfill their flying hobby. RCI's number 2 executive for nearly 20 years has been its Chief Technology Officer, it's not clear how a technology position could be the second most important position at a strip club business(ahead of a general counsel, COO, CMO, etc), until you see that he was previously a commercial pilot, so he is able to fly the planes and likely helped the CEO get his own pilots license. The CTO was originally justified as a hire to manage the internet division, which failed and produces less than 1% of revenue, but he has maintained his top role at the company.

(c) **Moreover, not only has there been numerous planes purchased, the usage of the planes have been a questionable use of corporate assets.**

According to the June 2018 Article, Defendant Reese posted a picture to his Facebook profile of a flight map that showed him using a corporate jet to make a Houston Texan's logo.

The June 2018 Article further stated in relevant part:

The flight records on one of the jets from the last few months alone show that despite their $30-54k car allowances, management routinely takes 15-20 minute flights to and from airports within different parts of Houston. Given the time spent driving to and from the hangers, preparing/taxing/parking the plane, pre-flight check lists, etc, it can't possibly save a material amount of time versus driving the already paid for automobiles. The list also includes a mid-day on a Tuesday 70 min joy ride taking off and landing at the same airport (KAXH).

Further, according to the 2018 10-K for the fiscal year ended September 30, 2018, Defendant Langan received $30,493 for the personal use of aircraft and Defendant Reese received $5,535 for the personal use of aircraft.

### (d)    Failed business ventures, such as the failed Los Angeles Club in 2012

On July 12, 2012, RCI released a press release that RCI had entered into a "joint venture" with Jerry Westlund ("Westlund"). Westlund was described as an "adult night club operator." The joint business venture that RCI and Westlund entered was for a topless nightclub located in Los Angeles County, California. RCI and Westlund each held 50% ownership. The next month, during an August 2012 earnings call, Defendant Langan was questioned about his expectations for the new Los Angeles joint venture. Defendant Langan responded, in relevant part:

> Yeah, I mean, I've talked with Jerry a lot on the deal. We believe the locations probably will do around 60,000 at least, or about $3 million a year. Our investments in the location currently is about $600,000, if it does a $3 million, $60,000 a week, we should probably at a 50% ownership in the property – or in the building – in the business, we'll probably make our money back cash-on-cash return of a 100% in about 12 to 18 months.

About a year later, RCI announced that it was buying Westlund out of his shares. According to the Company's 10-Q filed with the SEC for the period ended June 30, 2013:

> On May 29, 2013, our wholly owned subsidiary, RCI Entertainment (Delamo), Inc., completed the acquisition of the remaining 50% of 1957 Delamo, LLC, which owns a new adult cabaret in Los Angeles County, California that is scheduled to open this summer. We issued 100,000 restricted shares of our

common stock to an individual in consideration for outstanding membership interests of 1957 Delamo, LLC. These shares were valued at $863,000. The Company had previously paid $600,000 in cash for the initial 50% investment.

According to the Company's press release issued on August 29, 2013, the Los Angeles club finally received its liquor license. The press release stated, "Vivid Cabaret/LA, a new gentlemen's club with the look, feel and energy of the world's leading adult film company Vivid Entertainment, opens to the public today at 6 pm PT. The club, which has now received all relevant licenses from local and state regulators, is located at 1957 East Del Amo Blvd, Rancho Dominguez, CA…"

Although Defendant Langan and Westlund boasted that the Los Angeles club would be extremely profitable, in October of 2014, the Company sold its shares. The  Company's annual report for the fiscal year ended September 30, 2014 filed with the SEC on a Form 10-K on December 15, 2014, stated, "On October 16, 2014, the Company sold its wholly owned interest in 1957 Delamo, LLC, the operator of its Vivid Cabaret in Rancho Dominguez, California for $250,000 in cash. The Company recognized an impairment on the sale of $1.4 million as of September 30, 2014."

The June 2018 Article postulated that there was much more to this seeming business venture than met the eye. For instance, Westlund had previously been convicted of multiple crimes, including evading state income taxes and forgery related to embezzlement. Westlund had also previously been denied a liquor license in the past, due to his criminal record. The June 2018 Article, further outlined a timeline tracking the events leading up to the venture:

> **July 2012**: Shortly after Eric and Jerry partied together at the Super Bowl and Mardi Gras, RCI announced it was creating a joint venture with Jerry Westlund for a Los Angeles club. RCI was to pay $600k for 50% of the club.  However, the joint venture did not own the building and had not received a SOB license. Rather than paying for half of the construction/legal costs to build out the club, RCI apparently paid $600k up front for a 50% stake in the yet to be licensed club

or opened club. RCI expected the club to be open in "September or October of 2012".

**May 2013:** Almost a year later RCI announced it was buying out Jerry's 50% stake for 100,000 shares of Rick's stock ($3m+ at current prices, $800k-900k at time of transaction). The club had still not yet opened and had not received its license. RCI now owned 100% of a small club in California that it had originally planned to have Jerry operate. RCI was supposed to benefit from Jerry's LA-area business and political expertise, but now they have allowed him to cash out completely before the club even opened.

* * *

**Aug 2013:** The LA club finally received its license and opened. Despite Jerry telling Eric the club should do $3m in revenue and have a 12-18 month payback, the club was unsuccessful and was closed down within a year of opening.

**Oct 2014:** RCI sold the business for $250,000, a little over a year after spending roughly $1.5 million to buy it from Jerry.

It's clear the Los Angeles venture was a massive failure. The question is, did management knowingly enter a bad deal to help bail out a friend, or did Jerry pull a fast one on RCI by wining and dining the CEO?

### *Failure to Maintain Internal Controls*

98.     During the Relevant Period, as evident by the Mismanagement, the Individual Defendants failed to maintain effective internal controls in managing the Company. The Defendants admitted this in their 2018 10-K. RCI's auditor, BDO USA, LLP ("BDO"), further confirmed this in RCI's 2018 10-K. RCI's 2018 10-K stated, in relevant part, that management concluded that the Individual Defendants did not maintain effective internal controls:

Specifically, management identified material weaknesses over (1) revenues, (2) complex accounting matters related to assets held for sale, business combinations, income taxes, debt modifications, useful lives of leasehold improvements, and the impairment analyses for indefinite-lived intangible assets, goodwill, and property and equipment, (3) financial statement close and reporting, (4) information technology, and (5) segregation of duties—see Item 9A, "Controls and Procedures," below. While certain actions have been taken to implement a remediation plan to address these material weaknesses and to enhance our internal control over financial reporting, if these material weaknesses are determined to have not been remediated, it could adversely affect our ability to report our financial condition and results of operations in a timely

and accurate manner, which could negatively affect investor confidence in our company, and, as a result, the value of our common stock could be adversely affected.

RCI's auditor, BDO, similarly stated, in relevant part:

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) ("PCAOB"), RCI Hospitality Holdings, Inc.'s internal control over financial reporting as of September 30, 2018, based on criteria established in Internal Control – Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") and our report dated December 31, 2018 expressed an adverse opinion thereon.

## False and Misleading Statements

### *August 2017 Press Release and 3Q17 10-Q*

99.    On August 9, 2017, the Company issued a press release (the "August 2017 Press Release") formally announcing its third quarter financial results for the period ended June 30, 2017. The relevant part of the press release stated:

**3Q17 Highlights (comparisons to 3Q16, unless otherwise noted)**

- Diluted EPS of $0.40 compared to $0.27, up 48.1%
- Non-GAAP* Diluted EPS of $0.47 compared to $0.34, up 38.2%
- Basic and diluted share counts fell 1.9% and 3.3%, respectively, due to previously announced share repurchases and retirement of convertible debt
- Total revenues of $37.4 million compared to $34.0 million, up 10.2% on 44 vs. 43 units
- RCI now expects to exceed its original FY17 Free Cash Flow (FCF)* target of $18 million, which was based on estimated net cash provided by operating activities of ~$20.5 million
- The company also has established an initial FY18 FCF target of $21 million, which is based on estimated net cash provided by operating activities of ~$23.5 million
- As previously announced, RCI's 3Q17 $0.03 dividend was paid June 26, 2017

100.    Also, on August 9, 2017, the Company filed its third quarterly report with the SEC on a Form 10-Q for the period ended June 30, 2017 (the "3Q17 10-Q"), signed by

Defendant Langan and Defendant Marshall,  confirming the aforementioned August 2017 press release with regards to the Company's financial results. The 10-Q also, under "Related Party Transactions" stated specifically:

> On May 1, 2017, the Company raised $5.4 million through the issuance of 12% unsecured promissory notes to certain investors ("Investors"), which notes mature on May 1, 2020. The notes pay interest-only in equal monthly installments, with a lump sum principal payment at maturity. See Note 7. The notes were issued to several creditors, which include a Company employee with a share of $200,000. The terms of the employee note are uniform with all the other Investors' terms.
>
> Presently, our Chairman and President, Eric Langan, personally guarantees all of the commercial bank indebtedness of the Company. Mr. Langan receives no compensation or other direct financial benefit for any of the guarantees.

101.    Attached to the 3Q17 10-Q were certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Langan and Marshall attesting to the accuracy of the 3Q17 10-Q.

102.    The August 9, 2017 press release and 10-Q were false and misleading because they failed to disclose significant unfavorable facts about the Company's internal controls, operations, and business ventures.  Specifically, the 10-Q "Related Party Transactions" section failed to disclose any of the Related Party Transactions.

### 2017 Proxy Statement

103.    On August 10, 2017, the Company filed its Schedule 14A with the SEC (the "2017 Proxy Statement"). Defendants Langan, Anakar, Barabash, Jenkins, Lirot, Marshall and Reese solicited the 2017 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act which contained material misstatements and omissions.[12]

---

[12] Plaintiff's allegations with respect to the misleading statements in the 2017 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these

104.    The 2017 Proxy Statement stated, regarding the Company's "Compensation

Philosophy":

> The Compensation Committee emphasizes the important link between the
> Company's performance, which ultimately affects stockholder value, and the
> compensation of its executives. Therefore, the primary goal of the Company's
> executive compensation policy is to try to align the interests of the executive
> officers with the interests of the stockholders. In order to achieve this goal, the
> Company attempts to, (i) offer compensation opportunities that attract and retain
> executives whose abilities and skills are critical to the long-term success of the
> Company and reward them for their efforts in ensuring the success of the
> Company, (ii) align the Company's compensation programs with the Company's
> long-term business strategies and objectives, and (iii) provide variable
> compensation opportunities that are directly linked to the Company's
> performance and stockholder value, including an equity stake in the Company.
> Our named executive officers' compensation utilizes two primary components
> — base salary and long-term equity compensation — to achieve these goals.
> Additionally, the Compensation Committee may award discretionary bonuses to
> certain executives based on the individual's contribution to the achievement of
> the Company's strategic objectives.

105.    In regard to "Related Transactions" the section stated:

> Our Board of Directors has adopted a policy that our business affairs will be
> conducted in all respects by standards applicable to publicly held corporations
> and that we will not enter into any transactions and/or loans between us and our
> officers, directors and 5% shareholders unless the terms are no less favorable
> than could be obtained from independent, third parties and will be approved by a
> majority of our independent and disinterested directors. We currently have four
> independent directors, Steven Jenkins, Nour-Dean Anakar, Robert Watters and
> Luke Lirot.

> Presently, our Chairman and President, Eric Langan, personally guarantees all of
> the commercial bank indebtedness of the company. Mr. Langan receives no
> compensation or other direct financial benefit for any of the guarantees. Except
> for these guarantees, we know of no related transactions that have occurred since
> the beginning of the fiscal year ended September 30, 2016 or any currently
> proposed transactions.

106.    The 2017 Proxy Statement further stated, in part, regarding "The Role of

Shareholder Say-on-Pay Vote", "This vote, commonly known as a "say-on-pay" vote, gives a

---

allegations and related claims

company's stockholders the opportunity to endorse or not endorse the company's executive pay program and policies." However, with regard to the compensation program, the 2017 Proxy statement was false and misleading because it failed to disclose that the shares and value of RCI were artificially inflated, rendering the executive compensation undeserved and excessive and the shareholders unable to make informed votes. In addition, the "Related Transactions" section failed to disclose any of the Related Transactions.

107. Furthermore, the statements in the 2017 Proxy Statement were materially false and misleading, and they failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that: (1) the Company engaged in the Mismanagement; (2) the Mismanagement would likely subject the Company to heightened regulatory scrutiny, including by the SEC; (3) the Company's prospects would be harmed by investigations into its corporate governance, including by rendering RCI incapable of timely filing its financial statements; and (4) the Company failed to maintain internal controls. As a result, the Company's statements regarding RCI's business, performance, and prospects were materially false and misleading.

### *February 2018 Press Release and 2017 10-K*

108. On February 14, 2018, the Company issued a press release (the "February 2018 Press Release") formally announcing its fourth quarter and full year 2017 financial results for the year ended September 30, 2017. The relevant part of the press release stated:

**FY17 vs. FY16**

- Diluted EPS of $0.85 compared to $1.11, with non-GAAP* Diluted EPS at $1.43 compared to $1.32

- Basic and diluted share count declined 2.1% and 4.8%, respectively, due to previously announced share repurchases and retirement of convertible debt
- Total revenues of $144.9 million compared to $134.9 million
- Based on net cash provided by operating activities of $21.1 million, less maintenance capital expenditures of $1.8 million, FY17 free cash flow (FCF)* totaled $19.3 million, exceeding RCI's original target of $18 million

**FY18 Outlook**

- RCI increased its FY18 FCF target by 9.5%, to $23 million from $21 million, based on estimated net cash provided by operating activities of approximately $25.5 million, less maintenance capex of approximately $2.5 million
- The target incorporates RCI's preliminary estimate of the impact of the new Tax Cuts and Jobs Act, which is expected to significantly reduce the company's estimated tax rate to approximately 23% starting in 2Q18 and result in a non-cash gain of approximately $10 million in 1Q18 due to lowering the rate on deferred taxes

109.    Also on February 14, 2018, the Company filed its annual report with the SEC on a Form 10-K for the year ended September 30, 2017 (the "2017 10-K"), signed by Defendants Langan, Anakar, Barabash, Jenkins, Lirot, Marshall and Reese, confirming the aforementioned February 2018 press release with regards to the Company's financial results. The 2017 10-K also, under "Certain Relationships and Related Party Transactions, and Director Independence" stated specifically:

> Presently, our Chairman and President, Eric Langan, personally guarantees all of the commercial bank indebtedness of the company. Mr. Langan receives no compensation or other direct financial benefit for any of the guarantees. Except for these guarantees, we know of no related transactions that have occurred since the beginning of the fiscal year ended September 30, 2017 or any currently proposed transactions in which we were or are to be a participant and the amount involved exceeds $120,000.

Further, the 2017 10-K under Related Party Transactions, stated:

> Presently, our Chairman and President, Eric Langan, personally guarantees all of the commercial bank indebtedness of the Company. Mr. Langan receives no compensation or other direct financial benefit for any of the guarantees.

In August 2011, the Company borrowed $750,000 from a related party. The note bore interest at the rate of 10% per annum and matured on August 1, 2014. The note was payable with one initial payment of interest only due January 1, 2012, and, thereafter in ten interest-only quarterly payments. The principal was payable on August 1, 2014. The note was extended in 2014 under the same terms until maturity in October 2017. At the option of the holder, the principal amount of the note and the accrued but unpaid interest thereon could have been converted into shares of the Company's common stock at $10.00 per share. The note was redeemable by the Company after six months at any time if the closing price of its common stock for 20 consecutive trading days is at least $13.00 per share. The note was converted into shares during 2016.

110.   Attached to the 2017 10-K were SOX certifications signed by Defendants Langan and Marshall attesting to the accuracy of the 10-K.

111.   The February 2018 Press Release and 2017 10-K were false and misleading because they failed to disclose significant unfavorable facts about the Company's internal controls, operations, and business ventures. The 2017 10-K "Certain Relationships and Related Party Transactions, and Director Independence" and "Related Party Transactions" sections failed to disclose any of the Related Party Transactions.

### *March 2018 Press Release and 1Q18 10-Q*

112.   On March 7, 2018, the Company issued a press release (the "March 2018 Press Release") formally announcing its first quarter and full year 2018 financial statements. The relevant part of the press release stated:

**1Q18 vs. 1Q17**
- GAAP EPS of $1.47 per diluted share compared to $0.30, with non-GAAP* EPS of $0.53 compared to $0.31
- 1Q18 GAAP results included $9.7 million non-cash reduction of deferred tax liability as a consequence of the new Tax Cuts and Jobs Act and $827 thousand in interest expense covering debt issuance costs and prepayment penalties related to the previously announced debt refinancing
- Total revenues of $41.2 million compared to $33.7 million on 45 and 41 units, respectively

- Basic and diluted share count declined 0.5% and 1.0%, respectively, due to previously announced share repurchases and retirement of convertible debt in prior periods
- Based on net cash provided by operating activities of $8.1 million, less maintenance capital expenditures of $0.6 million, free cash flow (FCF)* totaled $7.5 million compared to $5.1 million

**FY18 Outlook**

- RCI is maintaining its FY18 FCF target of $23 million, recently announced February 14, 2018
- The target incorporates RCI's preliminary estimate of the impact of the new Tax Cuts and Jobs Act, which is expected to significantly reduce the company's estimated tax rate

113.    On March 7, 2018, the Company filed its first quarterly report with the SEC on a Form 10-Q for the period ended December 31, 2017 (the "1Q18 10-Q"), singed by Defendant Langan and Defendant Marshall, confirming the aforementioned March 2018 press release with regards to the Company's financial results. The 1Q18 10-Q under "Related Party Transactions" stated specifically, "Presently, our Chairman and President, Eric Langan, personally guarantees all of the commercial bank indebtedness of the Company. Mr. Langan receives no compensation or other direct financial benefit for any of the guarantees."

114.    Attached to the 1Q18 10-Q were SOX certifications signed by Defendants Langan and Marshall attesting to the accuracy of the 1Q18 10-Q.

115.    The March 7, 2018 press release and 10-Q were false and misleading because they failed to disclose significant unfavorable facts about the Company's internal controls, operations, and business ventures. The 1Q 18 10-Q "Related Party Transactions" section failed to disclose any of the Related Party Transactions.

***May 2018 Press Release and 2Q18 10-Q***

116.    On May 10, 2018, the Company issued a press release (the "May 2018 Press Release") formally announcing its second quarter and full year 2018 financial results. The relevant part of the press release stated:

**2Q18 vs. 2Q17**
- GAAP EPS of $0.48 per diluted share compared to $0.39, with non-GAAP* EPS of $0.65 compared to $0.41
- 2Q18 GAAP results included $1.6 million non-cash impairment of a note receivable and $0.8 million in cash settlements covering two lawsuits
- Total revenues of $41.2 million compared to $34.5 million on 43 and 41 units, respectively
- Based on net cash provided by operating activities of $5.9 million, less maintenance capital expenditures of $0.6 million, free cash flow (FCF)* totaled $5.3 million compared to $4.9 million

**FY18 Outlook**

- Year to date FCF totaled $12.8 million compared to $10.0 million in the comparable year-ago period
- As a result, RCI is reiterating its FY18 FCF target of $23 million, announced on February 14, 2018

117.    On May 10, 2018, the Company filed its second quarterly report with the SEC on a Form 10-Q for the period ended March 31, 2018 (the "2Q18 10-Q"), signed by Defendant Langan and Defendant Marshall, confirming the aforementioned May press release with regards to the financial statements. The 2Q18 10-Q under "Related Party Transactions" stated specifically, "Presently, our Chairman and President, Eric Langan, personally guarantees all of the commercial bank indebtedness of the Company. Mr. Langan receives no compensation or other direct financial benefit for any of the guarantees."

118.    Attached to 2Q18 10-Q were SOX  certifications signed by Defendants Langan and Marshall attesting to the accuracy of the 2Q18 10-Q.

119.    The press release and 10-Q filed on May 10, 2018 were false and misleading because they failed to disclose significant unfavorable facts about the Company's internal controls, operations, and business ventures. The 2Q 18 10-Q "Related Party Transactions" section failed to disclose any of the Related Party Transactions.

***2018 Proxy Statement***

120.    On July 18, 2018, the Company filed its 2018 Proxy Statement. Defendants Langan, Anakar, Barabash, Jenkins, Lirot, Marshall and Reese solicited the 2018 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act which contained material misstatements and omissions.[13]

121.    The 2018 Proxy Statement stated, regarding the Company's "Compensation Policy":

> The Compensation Committee emphasizes the important link between the Company's performance, which ultimately affects stockholder value, and the compensation of its executives. Therefore, the primary goal of the Company's executive compensation policy is to try to align the interests of the executive officers with the interests of the stockholders. In order to achieve this goal, the Company attempts to, (i) offer compensation opportunities that attract and retain executives whose abilities and skills are critical to the long-term success of the Company and reward them for their efforts in ensuring the success of the Company, (ii) align the Company's compensation programs with the Company's long-term business strategies and objectives, and (iii) provide variable compensation opportunities that are directly linked to the Company's performance and stockholder value, including an equity stake in the Company. Our named executive officers' compensation utilizes two primary components — base salary and long-term equity compensation — to achieve these goals. Additionally, the Compensation Committee may award discretionary bonuses to certain executives based on the individual's contribution to the achievement of the Company's strategic objectives.

122.    In regard to "Related Transactions" the section stated:

---

[13] Plaintiff's allegations with respect to the misleading statements in the 2018 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

Our Board of Directors has adopted a policy that our business affairs will be conducted in all respects by standards applicable to publicly held corporations and that we will not enter into any transactions and/or loans between us and our officers, directors and 5% shareholders unless the terms are no less favorable than could be obtained from independent, third parties and will be approved by a majority of our independent and disinterested directors. We currently have four independent directors, Steven Jenkins, Nour-Dean Anakar, Luke Lirot and Yura Barabash.

Presently, our Chairman and President, Eric Langan, personally guarantees all of the commercial bank indebtedness of the company. Mr. Langan receives no compensation or other direct financial benefit for any of the guarantees. Except for these guarantees, we know of no related transactions that have occurred since the beginning of the fiscal year ended September 30, 2017 or any currently proposed transactions.

123.    The 2018 Proxy Statement further stated, in part, regarding "say-on-pay" vote that it "gives a company's stockholders the opportunity to endorse or not endorse the company's executive pay program and policies." However, with regard to the compensation program, the 2018 Proxy statement was false and misleading because it failed to disclose that the shares and value of RCI was artificially inflated. Further, 2018 Proxy Statement was false and misleading because it failed to disclose significant unfavorable facts about the Company's internal controls, operations, and business ventures.  Thus, making the executive compensation undeserved and excessive and the shareholders unable to make an informed vote. In addition, the "Related Transactions" section failed to disclose any of the Related Transactions.

124.    The statements in the 2018 Proxy Statement were materially false and misleading, and they failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that: (1) the Company engaged in the Mismanagement; (2) the Mismanagement would likely subject the Company to heightened regulatory scrutiny, including

by the SEC; (3) the Company's prospects would be harmed by investigations into its corporate

governance, including by rendering RCI incapable of timely filing its financial statements; and

(4) the Company failed to maintain internal controls. As a result, the Company's statements

regarding RCI's business, performance, and prospects were materially false and misleading.

### *August 2018 Press Release and 3Q18 10-Q*

125.    On August 9, 2018, the Company issued a press release (the "August 2018 Press

Release") formally announcing its third quarter and full year 2018 financial results.    The

relevant part of the press release stated:

**3Q18 vs. 3Q17**

- GAAP EPS of $0.55 per diluted share compared to $0.40, with non-GAAP* EPS of $0.58 compared to $0.47
- 3Q18 GAAP results included a $0.5 million pre-tax settlement of a lawsuit
- Record total revenues of $42.6 million compared to $37.4 million on 44 units in both periods
- Based on net cash provided by operating activities of $8.3 million, less maintenance capital expenditures of $0.6 million, free cash flow (FCF)* totaled $7.7 million compared to $6.6 million

**FY18 Outlook**

- Year to date FCF totaled $20.6 million compared to $16.6 million in the comparable year-ago period
- As a result, RCI expects to exceed its FY18 FCF target of $23 million.

126.    On August 9, 2018, the Company filed its third quarter report with the SEC on a

Form 10-Q for the period ended June 30, 2018 (the "3Q18 10-Q"), signed by Defendant Langan

and Defendant Marshall, confirming the aforementioned August press release with regards to

the financial results. The 3Q18 10-Q also, under "Related Party Transactions", stated

specifically "Presently, our Chairman and President, Eric Langan, personally guarantees all of

the commercial bank indebtedness of the Company. Mr. Langan receives no compensation or other direct financial benefit for any of the guarantees." Attached to the 3Q18 10-Q were SOX certifications signed by Defendants Langan and Marshall attesting to the accuracy of the 3Q18 10-Q.

127.    The August 2018 Press Release and the 3Q18 10-Q were false and misleading because they failed to disclose significant unfavorable facts about the Company's internal controls, operations, and business ventures. The 3Q18 10-Q "Related Party Transactions" section failed to disclose any of the Related Party Transactions.

128.    The statements in ¶¶ 99-101, ¶¶108-110, ¶¶112-114, ¶¶116-118 and ¶¶ 125-126 were materially false and misleading, and they failed to disclose material facts necessary to make the statements made not false and misleading.  Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that: (1) the Company engaged in the Mismanagement; (2) the Mismanagement would likely subject the Company to heightened regulatory scrutiny, including by the SEC; (3) the Company's prospects would be harmed by investigations into its corporate governance, including by rendering RCI incapable of timely filing its financial statements;(4) the Company failed to maintain internal controls; and (5) as a result, the Company's statements regarding RCI's business, performance, and prospects were materially false and misleading.

**The Truth Begins to Emerge while False and Misleading Statements Continue**

*December 2018 Form 12b-25*

129.    On December 11, 2018, the Company filed the December 2018 Form 12b-25 with the SEC, signed by Defendant Marshall, stating "the registrant has experienced delays in

completing the audit of its financial statements for the year ended September 30, 2018. As a result, the registrant will be unable to timely file its Form 10-K for the year ended September 30, 2018 without unreasonable effort and expense."

130.   Thereafter, from the close of trading on December 11, 2018 to the close of trading on December 12, 2018, the Company's share price fell $1.37. On December 12, 2018, the Company's shares closed at $22.33 per share.

### December 2018 Press Release and 2018 10-K

131.   On December 31, 2018, the Company issued a press release (the "December 2018 Press Release") formally announcing its fourth quarter, full year 2018 and year 2018 initial outlook financial statements. The relevant part of the press release stated:

**4Q18 vs. 4Q17**

- Loss of $0.27 per share compared to a loss of $0.23
- Non-GAAP* profit of $0.41 per diluted share compared to $0.36
- GAAP results included $5.5 million in other charges compared to $6.2 million in 4Q17, mostly non-cash in both periods
- Free cash flow (FCF) totaled $2.7 million based on net cash provided by operating activities of $3.4 million, less maintenance capital expenditures of $0.7 million
- Total revenues of $40.7 million compared to $39.2 million on 43 and 45 units, respectively

**FY18 vs. FY17**

- Diluted EPS of $2.23 compared to $0.85
- Non-GAAP Diluted EPS of $2.18 compared to $1.43
- FCF totaled $23.2 million based on net cash provided by operating activities of $25.8 million, less maintenance capital expenditures of $2.5 million
- Total revenues of $165.7 million compared to $144.9 million

**FY19 Initial Outlook**

- FY19 is expected to benefit from, in addition to other factors, recent nightclub acquisitions in Chicago and Pittsburgh, the opening of

additional Bombshells Restaurant & Bar locations in the Houston area, and the sale or lease of non-income producing properties.

132.    On December 31, 2018, the Company filed the 2018 10-K, signed by Defendants Langan, Anakar, Barabash, Jenkins, Lirot, Marshall and Reese, confirming the aforementioned December 2018 press release with regards to the financial statements. The 2018 10-K also, under "Certain Relationships and Related Transactions, and Director Independence" stated specifically:

Presently, our Chairman and President, Eric Langan, personally guarantees all of the commercial bank indebtedness of the company. Mr. Langan receives no compensation or other direct financial benefit for any of the guarantees.

In November 2018, we borrowed $500,000 from Ed Anakar, an employee of the Company and the brother of our director Nourdean Anakar. The note bears interest at the rate of 12% per annum and matures in November 2021. The note is payable in monthly installments of interest only with a balloon payment of all unpaid principal and interest due at maturity.

Except for these above transactions, we know of no related transactions that have occurred since the beginning of the fiscal year ended September 30, 2018 or any currently proposed transactions in which we were or are to be a participant and the amount involved exceeds $120,000.

Further, under "Related Party Transactions," stated:

Presently, our Chairman and President, Eric Langan, personally guarantees all of the commercial bank indebtedness of the Company. Mr. Langan receives no compensation or other direct financial benefit for any of the guarantees.

In August 2011, the Company borrowed $750,000 from a related party. The note bore interest at the rate of 10% per annum and matured on August 1, 2014. The note was payable with one initial payment of interest only due January 1, 2012, and, thereafter in ten interest-only quarterly payments. The principal was payable on August 1, 2014. The note was extended in 2014 under the same terms until maturity in October 2017. At the option of the holder, the principal amount of the note and the accrued but unpaid interest thereon could have been converted into shares of the Company's common stock at $10.00 per share. The note was redeemable by the Company after six months at any time if the closing price of its common stock for 20 consecutive trading days is at least $13.00 per share. The note was converted into shares during 2016.

133.    Attached to the 2018 10-K were SOX certifications signed by Defendants Langan and Marshall attesting to the accuracy of the 2018 10-K.

134.    The press release and 10-K filed on December 31, 2018 were false and misleading because they failed to disclose significant unfavorable facts about the Company's internal controls, operations, and business ventures.  The 2018 10-K "Certain Relationships and Related Transactions, and Director Independence"  and "Related Party Transactions" sections failed to disclose any of the other aforementioned Related Party Transactions besides borrowing money from Ed Anakar.

***February 2019 Press Release and 1Q19 10-Q***

135.    On February 11, 2019, the Company issued a press release formally announcing its first quarter 2019 financial results. The relevant part of the press release stated:

**1Q19 vs. 1Q18**

- Diluted EPS of $0.65 compared to $1.47
- Diluted Non-GAAP* EPS of $0.61 compared to $0.53
- 1Q19 GAAP results included $1.2 million pre-tax gain on the sale of three non-income producing assets and $447K pre-tax non-operating loss reflecting the implementation of a new accounting standard
- 1Q18 GAAP results included $9.7 million deferred tax credit due to the new tax law and $827K in interest expense for debt issuance costs write-off and prepayment penalties related to a bank refinancing
- Free cash flow (FCF) totaled $11.1 million based on net cash provided by operating activities of $11.5 million, less maintenance capital expenditures of $0.4 million
- Total revenues of $44.0 million compared to $41.2 million on 46 and 45 units, respectively

**Other News**

- RCI reactivated its share buyback program in line with its capital allocation strategy, acquiring 28,211 shares from October 2018 to January 2019 for $660,000, or an average price of $23.39
- A subsidiary sold another non-income producing asset for an estimated $383K pre-tax gain in late January

136.    On February 11, 2019, the Company filed its first quarterly report with the SEC on a Form 10-Q for the period ended December 31, 2018, signed by Defendant Langan and Defendant Marshall, confirming the aforementioned February press release with regards to the financial statements. The 10-Q also, under "Related Party Transactions", stated specifically:

> Presently, our Chairman and President, Eric Langan, personally guarantees all of the commercial bank indebtedness of the Company. Mr. Langan receives no compensation or other direct financial benefit for any of the guarantees.

> Included in the $2.35 million borrowing on November 1, 2018 (see Note 6) was a $500,000 note borrowed from a related party. The terms of this related party note are similar to the rest of the lender group in the November 1, 2018 transaction

137.    Attached to the Form 10-Q were SOX certifications signed by Defendants Langan and Marshall attesting to the accuracy of the 10-Q. The press release and 10-K filed on February 11, 2019 were false and misleading because they failed to disclose significant unfavorable facts about the Company's internal controls, operations, and business ventures. The 10-Q Related Party Transactions section failed to disclose any other Related Party Transactions besides borrowing money from Ed Anakar.

**_Amended 1Q19 10-Q_**

138.    On March 1, 2019, the Company filed an amended 10-Q for the first quarter period ended December 31, 2018, outlined in the aforementioned paragraphs. The amended 10-Q stated:

> On February 11, 2019, RCI Hospitality Holdings, Inc. filed its Quarterly Report on Form 10-Q for the quarterly period ended December 31, 2018 ("Form 10-Q"). We are filing this Amendment No. 1 to Form 10-Q to revise both Section 302 Certifications filed as Exhibits 31.1 and 31.2 to the Form 10-Q to conform with the requirements of Item 601 of Regulation S-K, including to correct the introductory section of paragraph 4 to include language that was inadvertently omitted. Because the certification relates to the entire Form 10-Q, we are including the entire filing with this Amendment No.1.

**The Truth Continues to Emerge**

139.    On May 10, 2019, RCI filed the May 2019 Form 12b-25 with the SEC, signed by

Defendant Marshall, stating that RCI could not timely file its 2Q19 10-Q due to an ongoing

SEC inquiry and internal review, the 2Q19 10-Q stated, in relevant part:

> In mid- and late 2018, a series of negative articles about the registrant was
> anonymously published in forums associated with the short-selling community.
> Subsequently in 2019, the SEC initiated an informal inquiry. In connection with
> these events, a special committee of the registrant's Audit Committee engaged
> independent outside counsel to conduct an internal review. The registrant and its
> management are cooperating with both the internal review and the SEC inquiry.
> Because the internal review is still ongoing, the registrant will be delayed in
> filing its Form 10-Q.

140.    On this news, RCI's stock price fell $1.67 per share, or 7.5%, from closing at

$22.15 on May 10, 2019 to close at $20.48 on May 13, 2019.

**Repurchases During the Relevant Period**

141.    During the period in which the Company made false and misleading statements

and omissions, the Individual Defendants caused the Company to initiate repurchases of its

common stock at artificially inflated prices that substantially damaged the Company.

142.    According to the Company's Form 10-Q filed with the SEC on February 11,

2019, the Company spent an approximate aggregate amount of $355,738.31 to repurchase

14,111 shares of its own common stock from the period of October 1, 2018 through December

31, 2018, both dates inclusive, at an average of $25.15 per share.

143.    As the Company stock was actually only worth $15.61 per share, the price at a

low point on June 3, 2019, the Company overpaid approximately $135,465 in total for these

repurchases.

## DAMAGES TO RCI

144.    As a direct and proximate result of the Individual Defendants' conduct, RCI will lose and expend many millions of dollars.

145.    Such expenditures include, but are not limited to, legal fees associated with the Securities Class Actions filed against the Company and certain of the Individual Defendants, and any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto and in connection to the Mismanagement.

146.    Such losses include, but are not limited to, approximately $135,465 that the Company overpaid, at the direction of the Individual Defendants, for the Company's repurchases of its own stock at artificially inflated prices.

147.    Additionally, these expenditures include, but are not limited to, lavish compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

148.    As a direct and proximate result of the Individual Defendants' conduct, RCI has also suffered and will continue to suffer higher financing costs, a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

149.    Plaintiff brings this action derivatively and for the benefit of RCI to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of RCI, gross mismanagement, abuse of control,

waste of corporate assets, unjust enrichment, violations of Sections 14(a), 10(b) and 20(a) of the Exchange Act, as well as the aiding and abetting thereof.

150.   RCI is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

151.   Plaintiff is, and has been at all relevant times, a shareholder of RCI.  Plaintiff will adequately and fairly represent the interests of RCI in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

152.   Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

153.   A pre-suit demand on the Board of RCI is futile and, therefore, excused. At the time of filing of this action, the Board consists of Defendants Langan, Anakar, Barabash, Lirot and Reese (the "Director-Defendants"), and non-Parties Elaine J. Martin and Allan Priaulx (collectively, the "Directors"). Plaintiff needs only to allege demand futility as to four of the seven Directors who are on the Board at the time this action is commenced.

154.   Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts and to cause the Company to engage in the Mismanagement, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

155.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in causing the Company to engage in the Mismanagement and in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. While investors were duped into believing the fraud perpetrated by the Individual Defendants through their false and misleading statements and omissions, the Individual Defendants caused the Company to repurchase its own stock. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

156.    Additional reasons that demand on Defendant Langan is futile follow. Defendant Langan currently serves as the Company's CEO, and is thus, as the Company admits, a non-independent director. He is also the President and Chairman of the Board.  He has received and continues to receive lavish compensation as described above. Defendant Langan was ultimately responsible for all of the false and misleading statements and omissions that were made, including those contained in the SEC filings and press releases referenced herein, almost all of which he personally made statements in or signed.  As the Company's highest officer and as a trusted Company director, he conducted little, if any, oversight of the schemes to engage in the Mismanagement and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets.  Moreover, Defendant Langan is a defendant in the Securities Class Actions.  For these reasons, Defendant Langan

breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

157.    Additional reasons that demand on Defendant Anakar is futile follow.  Defendant Anakar currently serves as the Director for RCI. He also serves on the Audit Committee, Compensation Committee and Nominating Committee. Defendant Anakar has received and continues to receive compensation for his roles within the Company as described above.  As a trusted Company director and a member of the Audit and Compensation Committees, he conducted little, if any, oversight of the Company's engagement in the Mismanagement or the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets.  Lastly, and most importantly, Defendant Anakar is the brother of the Director of Operations for RCI, Ed Anakar. He has a clear interest in continuing and/or allowing the fraudulent scheme to continue in order to benefit himself, the other Directors, and his brother. For these reasons, Defendant Anakar breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

158.    Additional reasons that demand on Defendant Barabash is futile follow. Defendant Barabash currently serves as a Director for RCI. He also serves on the Audit Committee, Compensation Committee and Nominating Committee. As a trusted Company director and a member of the Audit and Compensation Committees, he conducted little, if any, oversight of the Company's engagement in Mismanagement and the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect

corporate assets. For these reasons, Defendant Barabash breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

159.    Additional reasons that demand on Defendant Lirot is futile follow.  Defendant Lirot currently serves as a Director for RCI. He also serves on the Nominating Committee and Compensation Committee. Defendant Lirot has received and continues to receive compensation for his roles within the Company as described above. As a trusted Company director and a member of the Audit Committee, he conducted little, if any, oversight of the Company's engagement in the Mismanagement and the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets.  Lastly, and most importantly, Defendant Lirot is a lawyer who has represented RCI in numerous lawsuits. He has a clear interest in continuing and/or allowing the fraudulent scheme to continue in order to benefit himself by continuing to receive legal work and/or additional compensation from the Company pertaining thereto. If Defendant Lirot reported or tried to end the fraudulent scheme, the other Directors may have stopped giving him business.  For these reasons, Defendant Lirot breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

160.    Additional reasons that demand on Defendant Reese is futile follow.  Defendant Reese currently serves as a Director for RCI. He also serves as RCI's Executive Vice President, and is thus, a non-independent director. Defendant Reese has received and continues to receive lavish compensation for his roles within the Company as described above. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the

Mismanagement and the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets.  For these reasons, Defendant Reese breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

161.    Additional reasons that demand on the Board is futile follow.

162.    The Director-Defendants have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. These conflicts of interest precluded the Director-Defendants from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, demand upon the Director-Defendants would be futile.

163.    RCI has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for RCI any part of the damages RCI suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

164.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct.  Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be

capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

165.    The acts complained of herein constitute violations of fiduciary duties owed by RCI's officers and directors, and these acts are incapable of ratification.

166.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of RCI. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of RCI, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

167.    If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause RCI to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability.  Accordingly, demand is futile in that event, as well.

168.    Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least four of the Directors, cannot consider a demand with disinterestedness and independence.  Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against Individual Defendants for Violations of
### Section 14(a) of the Exchange Act

169.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

170.    The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these nonfraud claims.

171.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

172.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or

which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

173.    Under the direction and watch of the Directors, the 2017 and 2018 Proxy Statements (the "Proxy Statements") failed to disclose, *inter alia*, that: (1) the Company engaged in the Mismanagement; (2) the Mismanagement would likely subject the Company to heightened regulatory scrutiny, including by the SEC; (3) the Company's prospects would be harmed by investigations into its corporate governance, including by rendering RCI incapable of timely filing its financial statements; and (4) the Company failed to maintain internal controls. As a result, the Company's statements regarding RCI's business, performance, and prospects were materially false and misleading. The Individual Defendants also caused the Proxy Statements to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements, including equity awards designed to link RCI compensation to shareholders' interests while failing to disclose that the Company's share price was artificially inflated as a result of false and misleading statements alleged herein, and therefore any compensation based on the Company's financial performance was artificially inflated. This caused the compensation to executives excessive and undeserved. Further, because the shareholders were unaware of the truth, their votes on the executive compensation amounts were uninformed.

174.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the Proxy Statements were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder

determination in the Proxy Statements, including, but not limited to, election of directors, ratification of an independent auditor, and the approval of executive compensation.

175.   The false and misleading elements of the Proxy Statements led to the re-election of Defendants Langan, Anakar, Barabash, Jenkins, Lirot, Marshall and Reese, which allowed them to continue breaching their fiduciary duties to RCI.

176.   The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the Proxy Statements.

177.   Plaintiff on behalf of RCI has no adequate remedy at law.

## SECOND CLAIM

### Against Individual Defendants for Violations of
### Section 10(b) of the Securities Exchange Act of 1934

178.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

179.   Section 10(b) of the Exchange Act, 15 U.S.C. § 78j, provides, in relevant part, that "[i]t shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, (a) to employ any device, scheme, or artifice to defraud, (b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."

180.   The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding RCI. Not only is RCI now defending claims that it violated Section

10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon RCI by the Individual Defendants. With the price of its common stock trading at artificially-inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase approximately 14,111 shares of its own securities at artificially-inflated prices, damaging RCI.

181.    The Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's public statements.

182.    The Individual Defendants employed devices, schemes and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about RCI not misleading.

183.    The Individual Defendants, as top executives and directors of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by RCI.

184.    The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the schemes and the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to

ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the schemes set forth herein and for the false and misleading statements and/or omissions disseminated to the public through press releases, conference calls, and filings with the SEC.

185.   By virtue of the foregoing, the Individual Defendants have violated § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

186.   Plaintiff on behalf of RCI has no adequate remedy at law.

## THIRD CLAIM

### Against Individual Defendants for Violations of Section 20(a) of the Securities Exchange Act of 1934

187.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

188.   Section 20(a) of the Exchange Act, 15 U.S.C. § 78t, provides, in relevant part, that "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation of cause of action."

189.   The Individual Defendants, by virtue of their positions with RCI and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of RCI and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act. The Individual Defendants had the power

and influence and exercised the same to cause RCI to engage in the illegal conduct and practices complained of herein.

190.    Plaintiff on behalf of RCI has no adequate remedy at law.

## FOURTH CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

191.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

192.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of RCI's business and affairs.

193.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

194.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of RCI.

195.    In breach of their fiduciary duties, the Individual Defendants knowingly or recklessly caused the Company to engage in or allow the Mismanagement.

196.    In breach of their fiduciary duties owed to RCI, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) the Company engaged in the Mismanagement; (2) the Mismanagement would likely subject the Company to heightened regulatory scrutiny, including by the SEC; (3) the Company's prospects would be harmed by investigations into its corporate governance, including by rendering RCI incapable of timely filing its financial statements; and (4) the Company failed to maintain

internal controls. As a result, the Company's statements regarding RCI's business, performance, and prospects were materially false and misleading.

197.   The Individual Defendants also failed to correct and caused the Company to fail to correct the false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

198.   Also, in breach of their fiduciary duties, the Individual Defendants failed to maintain internal controls.

199.   The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of RCI's securities.

200.   The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain internal controls.  The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them.  Such improper

conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of RCI's securities.

201.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

202.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, RCI has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

203.    Plaintiff on behalf of RCI has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Unjust Enrichment

204.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

205.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, RCI.

206.    The Individual Defendants either benefitted financially from the improper conduct tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from RCI that was tied to the performance or artificially inflated valuation of RCI, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

207.    Plaintiff, as a shareholder and a representative of RCI, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation, including any performance-based or valuation-based compensation,

obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

208.    Plaintiff on behalf of RCI has no adequate remedy at law.

## SIXTH CLAIM

### Against Individual Defendants for Abuse of Control

209.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

210.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence RCI, for which they are legally responsible.

211.    As a direct and proximate result of the Individual Defendants' abuse of control, RCI has sustained significant damages.  As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, RCI has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

212.    Plaintiff on behalf of RCI has no adequate remedy at law.

## SEVENTH CLAIM

### Against Individual Defendants for Gross Mismanagement

213.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

214.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of RCI in a manner consistent with the operations of a publicly-held corporation.

215.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, RCI has sustained and will continue to sustain significant damages.

216.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

217.    Plaintiff on behalf of RCI has no adequate remedy at law.

## EIGHTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

218.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

219.    The Individual Defendants caused the Company to pay themselves excessive salaries, bonuses, fees, stock grants, car allowances and also caused the Company to pay out loans, among other inappropriate things, to the detriment of the shareholders and the Company.

220.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, Defendants have caused RCI to waste valuable corporate assets, to incur many millions of dollars of legal liability and costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

221.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

222.    Plaintiff on behalf of RCI has no adequate remedy at law.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)      Declaring that Plaintiff may maintain this action on behalf of RCI, and that Plaintiff is an adequate representative of the Company;

(b)      Declaring that the Individual Defendants have breached their fiduciary duties to RCI;

(c)      Determining and awarding to RCI the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)      Directing RCI and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect RCI and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2. a provision to permit the shareholders of RCI to nominate at least four candidates for election to the board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)      Awarding RCI restitution from Individual Defendants, and each of them;

(f)      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.


Dated: August 16, 2019.                    Respectfully submitted,

**STECKLER GRESHAM COCHRAN PLLC**


*/s/ R. Dean Gresham*
R. Dean Gresham
Texas Bar No.: 24027215
12720 Hillcrest Road, Suite 1045
Dallas, Texas 75230
Telephone: (972) 387-4040
Facsimile: (972) 387-4041
Email: dean@stecklerlaw.com

*Liaison Counsel for Plaintiff*

**PAWAR LAW GROUP, P.C.**
Vik Pawar (to be admitted *PHV*)
20 Vesey Street, Suite 1210
New York, NY 10007
Telephone: (212) 571-0805
Facsimile: (212) 571-0938
Email: vik@pawarlaw.com

**THE BROWN LAW FIRM, P.C.**
Timothy Brown (to be admitted *PHV*)
240 Townsend Square
Oyster Bay, New York 11771
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*

## VERIFICATION

I, Michael Cecere, am a plaintiff in the within action.  I have reviewed the allegations made in this shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this _th day of _____, 2019.

8/16/2019

DocuSigned by:

20339EBB9923420...

Michael Cecere